# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LARRY KLAYMAN, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-1484 (TSC) |
| | ) | |
| BARACK HUSSEIN OBAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Larry Klayman visited Israel in 2014, when violence related to the Palestinian organization Hamas erupted. He and seven anonymous plaintiffs allege they (or their decedents) were "subject to the crimes of attempted murder and of assault by HAMAS . . . ." (Am. Compl. ¶¶ 16–18, ECF No. 7). The Plaintiffs allege a scheme to "funnel money from within the United States of America" in order to "finance terrorism by HAMAS and its parent the Muslim Brotherhood . . . ." (*Id.* ¶ 20). Plaintiffs have sued Hamas, President Obama, Secretary of State John Kerry, former Secretary of State Hillary Clinton, United Nations Secretary-General Ban Ki-Moon, and Malik Obama, bringing a litany of claims under RICO, the Anti-Terrorism Act, the Constitution, and common law. The President and Secretaries of State (the "Federal Defendants"), the only Defendants who have been served with the Complaint and have entered appearances, have moved to dismiss the Complaint. For the following reasons, the court GRANTS the motion (ECF No. 9) and dismisses all claims against the Federal Defendants.[1]

---

[1] In their opposition, Plaintiffs argued in the alternative that the court should grant leave to file an amended complaint. (Pls.' Opp'n at 27–28, ECF No. 13). To the extent this is a motion for leave to file an amended complaint, it was not made in compliance with federal or local rules. *See* FED. R. CIV. P. 7(b)(1) ("A request for a court order must be made by motion."); D.D.C. L. CIV. R. 7(c) ("Each motion and opposition shall be accompanied

Three defendants have not entered an appearance: Malik Obama, Secretary-General Ban Ki-Moon, and Hamas.  As of April 27, 2015 no proof of service had been filed as to those defendants and on that day the court ordered Plaintiffs to show cause, on or before May 11, 2015, as to why the court should not dismiss the claims against those defendants for failure to effect service.  (Minute Order to Show Cause, Apr. 27, 2015).  Plaintiffs responded that service was made on Ban Ki-Moon and requested additional time within which to serve Hamas and Malik Obama.  (Pls.' Service Response, ECF No. 19).[2]  As discussed in Section III.G, *infra*, the request for additional time will be GRANTED.

On June 22, 2015 the court ordered Plaintiffs to show cause why Ban Ki-Moon should not be dismissed from this case in light of the immunity granted to him under the Vienna Convention on Diplomatic Relations and 22 U.S.C. § 254d.  (Minute Order to Show Cause, June 22, 2015).  At the court's invitation, the United States submitted a statement of interest pursuant to 28 U.S.C. § 517.  For the reasons set forth in Section III.H, *infra*, all claims against Ban Ki-Moon will be DISMISSED.

---

by a proposed order"); *id.* R. 7(i) ("A motion for leave to file an amended pleading shall be accompanied by an original of the proposed pleading as amended"); *id.* R. 15.1 (same).  It is within the court's discretion to deny a request made in this procedurally deficient manner.  *See Benoit v. U.S. Dep't of Agric.*, 608 F.3d 17, 21 (D.C. Cir. 2010).  If Plaintiffs believe they can amend the Amended Complaint to address the deficiencies discussed below, they may file a motion seeking leave to amend the complaint within 14 days of the date of this opinion.  In addition to complying with all relevant local and federal rules, any such motion must include, as an exhibit, a copy of the proposed amended pleading showing in redline the proposed changes.  In drafting a Second Amended Complaint, Plaintiffs are reminded that the court's Opinion identifies high, in some cases nearly absolute, bars to many of their claims and that the court is within its discretion to disregard allegations in a Second Amended Complaint which directly contradict allegations in the First Amended Complaint.  *See, e.g.*, *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324–25 (Fed. Cir. 1998); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171 (D.D.C. 2013).

[2] Plaintiffs suggested in their Service Response that alternative service under FED. R. CIV. P. 4(f)(3) might be appropriate.  No procedurally proper request for an order authorizing such service has been made and the court declines without prejudice to consider this half-formed request.  *See, e.g.*, *Freedom Watch Inc. v. OPEC*, 766 F.3d 74, 82 (D.C. Cir. 2014) (once the district court considered an improperly raised request, abuse of discretion standard applied).

## I.     FACTUAL ALLEGATIONS

Plaintiffs Larry Klayman and John Does 1 through 4 were physically present in Israel in the summer of 2014, when violence erupted in that country.  (Am. Compl. ¶¶ 16–17).  They allege that, due to their presence in the country at that time, they were "subject to the crimes of attempted murder and of assault by HAMAS" and were "subject to terroristic threats, fear, intimidation and blackmail from HAMAS . . . ." (*Id.*).[3]  Three additional Jack Roe plaintiffs are the parents of children killed in Israel and the Gaza Strip during the 2014 conflict.  (*Id.* ¶ 18).  The Plaintiffs allege that the Federal Defendants, along with Malik Obama and Ban Ki-Moon, have aided and abetted acts of terrorism committed by Hamas by providing funds and tacit support for those acts.

Resolution of the Federal Defendants' motion to dismiss turns, in almost all respects, on the nature of the conduct purportedly undertaken by those Defendants.  Plaintiffs' Amended Complaint rises or falls on the extent to which the Federal Defendants' actions are deemed to be within the scope of each Federal Defendant's authority as an official of the United States.  The court's focus in reciting the factual background is therefore on the nature of the Federal Defendants' alleged conduct and that conduct's relationship to each Defendant's authority as an official of the United States.

### A.  President Obama

The Amended Complaint alleges that in 2009, President Obama "ordered that $900 million be sent to Gaza" purportedly in the form of humanitarian aid, with the knowledge (and, possibly, the intention) that the money would be used to fund Hamas' terrorism.  (*Id.* ¶ 39).

---

[3] The Amended Complaint contains extensive allegations of Hamas' history of terrorism and violence.  (Am. Compl. ¶¶ 74–104).  Because the adequacy of the allegations as to Hamas are not in dispute for purposes of this motion and the substance of those allegations is largely irrelevant to resolution of the instant motions, the court does not set forth those allegations here.

Plaintiffs allege that bags of U.S. dollars found in the wreckage of an Israeli military strike against a Hamas leader "were provided to HAMAS at the direction of Barack Hussein Obama from the U.S. State Department 'slush fund.'" (*Id.* ¶ 44). This "slush fund" is a discretionary fund established at Secretary Clinton's request for use in North Africa and the Middle East. (*Id.* ¶ 132).[4] President Obama is alleged to have "corruptly misused and abused his position while President of the United States to cause funding and material support to be transferred to HAMAS . . . ." (*Id.* ¶ 47).[5] Plaintiffs allege the President has "personally collaborated with, conspired with, aided and abetted HAMAS' money laundering of funds," (*id.* ¶ 55), and, in his role as commander in chief, "threatened Israel that U.S. aid would be cut off if [Israel] does not make peace with HAMAS . . . ." (*Id.* ¶ 54; *see also id.* ¶ 49 (President Obama has "personally caused military weapons of the United States military, Libyan military and benefactors of the Libyan uprising called the 'Arab Spring' to be transferred from the territory of Libya to the Muslim Brotherhood generally")). Overall, "[a]s President and Commander in Chief, Defendant Barack Hussein Obama has intentionally and deliberately used the resources of the United States of America government to strengthen the Muslim Brotherhood and HAMAS around the world . . . ." (*Id.* ¶ 73).[6]

---

[4] This "slush fund" is authorized by Congress. (*Id.* ¶ 132 (Secretary Clinton "asked Congress to authorize" a discretionary fund)). Plaintiffs complain that the State Department has "provided no account or report of the use of the funds." (*Id.* ¶ 134). There is no allegation that the State Department is required to provide any such accounting.

[5] The Amended Complaint includes a lengthy recitation of President Obama's alleged Muslim faith. (Am. Compl. ¶¶ 62–73). Because, as Plaintiffs acknowledge, "a person is free to exercise their chosen religion in the United States of America," (*id.* ¶ 62), the purpose of these allegations is unclear.

[6] The Amended Complaint goes on to allege that President Obama pressured Israel to comply with Hamas' demands, (*id.* ¶ 56), and "interfere[ed] with Israel's efforts to defeat HAMAS militarily . . . ." (*Id.* ¶ 57). Although the Plaintiffs allege that President Obama had a personal motive for doing so, it is clear that Plaintiffs are referring to foreign policy positions taken by the President on behalf of the United States of America. This is further clarified by Plaintiffs' opposition, which argues that each Federal Defendant was "fully aware of the facts alleged in the Complaint" because they have "monitored on behalf of U.S. foreign policy and [*sic*] the conduct of the entire U.S. military hot wars in and around Israel with Hamas . . . ." (Pls.' Opp'n at 11).

President Obama is also alleged to support the efforts of his half-brother, defendant Malik Obama, to raise money through the Barack H. Obama Foundation (the "Foundation").  The Amended Complaint alleges that this Foundation operates in the name of President Obama.  (*Id.* ¶¶ 105–08).  However, a news article cited in the Amended Complaint as proof of this link (*id.* at 26 n.24) includes a screen shot of the Foundation's website, which makes clear that the Foundation is named in honor of President and Malik Obama's *father*, Barack H. Obama, Sr., and "is not dependent on the endorsement of" President Obama."  (*Id.*).[7]  Given the disavowal by the Foundation of any link to the President, the court disregards allegations that the President approves the Foundation's use of his name as a fundraising tool.[8]

### B.  Secretaries Clinton and Kerry

The Amended Complaint alleges that despite sanctions imposed on Hamas by the United States, then-Secretary of State Hillary Clinton, "under color of law," caused funds from the Department of State to be sent to Hamas.  (*Id.* ¶ 131–34).  Together with President Obama, through the U.S. consulate in Benghazi, Secretary Clinton directed a flow of U.S. weapons from Libya into Syria and Gaza.  (*Id.* ¶ 136–37).[9]  Similarly, current Secretary of State John Kerry has "continued the pattern and practices of his predecessor Hillary Clinton by providing funding to

---

[7] The Court may consider this article on a motion to dismiss because it is incorporated by reference into the Complaint.  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Although, as discussed below in Section II, *infra*, the court must presume the truth of the allegations in the Amended Complaint, it need not accord this presumption of truth to allegations which are flatly contradicted by other parts of the Amended Complaint.  *Redmon v. U.S. Capitol Police*, No. 13-cv-1323 (TSC), 2015 WL 682404, at *6 (D.D.C. Feb. 18, 2015) (citing *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004)).

[8] Further allegations about the nature of Malik Obama's relations with Hamas and other extremist organizations are not summarized here, as the allegations against Malik Obama are not at issue for purposes of this Opinion.

[9] The Amended Complaint separately alleges that the Clinton family has "amassed a fortune" from speaking fees, paid by those with interests "hostile to Jews and to Israel."  (Am. Compl. ¶¶ 139–40).  While this may explain a motive for the positions Secretary Clinton has taken, the Secretary's motive is largely inapposite to the analysis necessary for this decision.

HAMAS" and "has actively sought to interfere with attempts by Israel to stop the violence."  (*Id.*

¶¶ 148–49).

## II.   LEGAL BACKGROUND

### A. Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction.  *See Gen. Motors Corp. v. EPA*, 363 F.3d

442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an

examination of our jurisdiction.")  The law presumes that "a cause lies outside [the court's]

limited jurisdiction" unless the party asserting jurisdiction establishes otherwise.  *Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S 375, 377 (1994).  When a defendant files a motion

to dismiss a complaint for lack of subject matter jurisdiction, the plaintiff bears the burden of

establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.,* 217 F. Supp. 2d 59, 63

(D.D.C. 2002).

"Under the doctrine of sovereign immunity, the United States is immune to suit unless it

explicitly consents to being sued."  *Russell v. Dupree*, 844 F. Supp. 2d 46, 49 (D.D.C. 2012)

(citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).  To survive a Rule 12(b)(1) motion,

plaintiff must show that sovereign immunity has been waived.  *Id.* (citing *Jackson v. Bush*, 448

F. Supp. 2d 198, 200 (D.D.C. 2006)).  Claims brought against an official in his or her official

capacity are, "in all respects other than name, to be treated as a suit against the" United States,

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985), and, "[a]bsent a specific waiver by the

government, sovereign immunity bars" those claims.  *Keyter v. Bush*, No. 03-cv-2496 (EGS),

2004 WL 3591125, at *2 (D.D.C. Aug. 6, 2004) (citing *Clark v. Library of Congress*, 750 F.2d

89, 103 (D.C. Cir. 1984)); *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 262 (D.D.C. 2013)

("Sovereign immunity bars suits for money damages against the government itself, and against public officials sued in their official capacities") (internal quotation and alteration omitted).

Suits against a federal official in his or her official capacity must be distinguished from suits against a federal official in his or her individual (personal) capacity for acts taken in the course of official duties or while acting under the color of law. *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 29 (D.D.C. 2007) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)). In some circumstances, the claims are one and the same. For instance, tort claims against individual officials of the United States for conduct undertaken while performing their official duties may be deemed to be claims against the United States subject to limitations of the sovereign immunity waiver of the Federal Tort Claims Act. *See infra* Section III.A.iii. In other circumstances, the distinction permits a valid claim, or at least requires further immunity analysis. *See infra* Section III.B.

In evaluating a motion to dismiss for lack of subject-matter jurisdiction, the court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" *Am. Nat'l Ins. Co. v. F.D.I.C.,* 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi,* 394 F.3d 970, 972 (D.C. Cir. 2005)). Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Disner v. United States,* 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States,* 461 F. Supp. 2d 71, 73 (D.D.C. 2006)) (internal quotation marks omitted).

Finally, when considering a motion to dismiss for lack of subject matter jurisdiction, the court "is not limited to the allegations of the complaint." *Hohri v. United States,* 782 F.2d 227,

241 (D.C. Cir. 1986), *vacated on other grounds,* 482 U.S. 64 (1987).  Rather, "a court may

consider such materials outside the pleadings as it deems appropriate to resolve the question [of]

whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics,* 104 F.

Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C.

Cir. 1992)).

### B.  Failure to State a Claim

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint."  *Browning v.

Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks and citation

omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal citation

omitted).  Although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very

remote and unlikely[,]" the facts alleged in the complaint "must be enough to raise a right to

relief above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56

(2007) (internal quotation marks and citation omitted).  Moreover, a pleading must offer more

than "labels and conclusions" or a "formulaic recitation of the elements of a cause of

action."  *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).  If the facts as alleged,

which must be taken as true, fail to establish that a plaintiff has stated a claim upon which relief

can be granted, the Rule 12(b)(6) motion must be granted.  *See, e.g., Am. Chemistry Council, Inc.

v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

In deciding a 12(b)(6) motion, a court may "consider only the facts alleged in the

complaint, any documents either attached to or incorporated in the complaint and matters of

which [the court] may take judicial notice."  *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624.

The court may also consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (internal quotation marks and citations omitted); *see also Kaempe*, 367 F.3d at 965 ("It is also clear that these documents – which were appended to Myers' motion to dismiss and whose authenticity is not disputed – may be considered here because they are referred to in the complaint and are integral to Kaempe's conversion claim.").

### C.  Service of Process

#### i.  Time Limitations

Federal Rule 4(m) states:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—*must* dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

FED. R. CIV. P. 4(m) (emphasis added).

The plaintiff bears the burden of establishing either proper service of process, *see Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987); *OPEC*, 766 F.3d at 78, or "valid reason for delay" warranting an extension of time to effect service. *Mann v. Castiel*, 681 F.3d 368, 375 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  The D.C. Circuit has noted good cause for failure to effect timely service exists in three types of circumstances.  The first is when "outside factor[s]"—such as when a defendant evades service or conceals a defect in service—contributed to the service failure.  *Id.* at 374 (quoting *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d

1277, 1281 (11th Cir. 2007)).  Second, courts will be lenient towards a *pro se* plaintiff[10] who

makes honest mistakes, or who "proceeds *in forma pauperis* and [i]s entitled to rely on the

United States marshal (or deputy marshal) to effect service . . . ."  *Id.*; *see also Dumaguin v.*

*Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1221 (D.C. Cir. 1994).  Third, good cause exists

where a statute of limitations would bar refiling the action.  *Mann*, 681 F.3d at 376; *see also* FED.

R. CIV. P. 4(m) (advisory committee's note).

 Conversely, circumstances such as negligence, attorney mistake, ignorance of the rules

governing service, or evidence of a plaintiff's "inadvertence, oversight, or neglect" do not

establish the requisite good cause.  *Mann*, 681 F.3d at 376 (internal quotation marks and citation

omitted); *Whitehead v. CBS/Viacom, Inc.*, 221 F.R.D. 1, 3 (D.D.C. 2004).  If a plaintiff claims

service on a particular party is impossible by conventional means, the court may consider

whether plaintiffs in other cases have successfully served that party.  *See Angellino v. Royal*

*Family Al-Saud*, 688 F.3d 771, 776-77 (D.C. Cir. 2012).

 If a plaintiff fails to show good cause for failing to meet the service deadline, "the court

has a choice between dismissing the suit and giving the plaintiff more time" to properly effect

service.  *Battle v. District of Columbia*, 21 F. Supp. 3d 42, 44–45 (D.D.C. 2014) (collecting

cases).  The D.C. Circuit has instructed that "when there exists a reasonable prospect that service

can be obtained," an extension of time, rather than dismissal, is appropriate.  *Barot v. Embassy of*

*the Repub. of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015) (quoting *Novak v. World Bank*, 703 F.2d

1305, 1310 (D.C. Cir. 1983)) (internal quotation marks omitted).

### ii.  Service on Individuals within the United States

---

[10] Although counsel for plaintiffs is also a *pro se* plaintiff, he is an attorney who has practiced extensively before this court and not the "unsophisticated" *pro se* plaintiff to which the court must give extra latitude.  *See, e.g.*, *Mann*, 681 F.3d at 376.

An individual in the United States may be served by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

   (A) delivering a copy of the summons and of the complaint to the individual personally;

   (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

   (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

FED. R. CIV. P. 4(e).  Rule 4(e) does not contemplate service on an individual at his or her place of work.  *See, e.g.*, *Auleta v. U.S. Dep't of Justice*, No. 11-cv-2131 (RWR), 2015 WL 738040, at *2 (D.D.C. Feb. 20, 2015) (noting that service at defendant's place of business did not comport with Federal or D.C. rules of service).

### iii.  Service on Individuals Outside the United States

An individual outside the United States may be served:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

   (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

   (B) as the foreign authority directs in response to a letter rogatory or letter of request; or

   (C) unless prohibited by the foreign country's law, by:

         (i) delivering a copy of the summons and of the complaint to the individual personally; or
         (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

FED. R. CIV. P. 4(f).

### D.  Diplomatic Immunity

The Vienna Convention on Diplomatic Relations ("Vienna Convention"), Apr. 18, 1961, 23 U.S.T. 3227, provides diplomats with "absolute immunity from civil and criminal process," with three exceptions.  *Devi v. Silva*, 861 F. Supp. 2d 135, 140 (S.D.N.Y. 2012).  These are for actions related to private immovable property, actions related to succession of property, and actions related to professional or commercial activity by the diplomat "outside his official functions."  Vienna Convention, art. 31.  22 U.S.C. § 254d mandates that any action "against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Immunity . . . shall be dismissed."

## III.  ANALYSIS

### A.  Claims Against Federal Defendants in Official Capacities

Plaintiffs purport to bring claims against the Federal Defendants acting "under color of law" and individually.  (Am. Compl. at 2; Pls.' Opp'n at 1).  To the extent the claims against the Federal Defendants are in their official capacities, those claims are construed as claims against the United States and may proceed only where sovereign immunity has been waived.  *Keyter*, 2004 WL 3591125, at *2.

#### i.  Counts One Through Three: RICO

Count One alleges a violation of 18 U.S.C. § 1962(b), which makes it unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain . . . any interest in or control of any enterprise" engaged in interstate or foreign commerce.  (*See* Am. Compl. ¶¶ 166–80).  Count Two alleges a violation of 18 U.S.C. § 1962(c), which prohibits the conduct of an enterprise through a pattern of racketeering activity.  (*See id.* ¶¶ 181–85).  Finally, Count Three

alleges a violation of 18 U.S.C. § 1962(d), which makes illegal any conspiracy to violate § 1962. (*See id.* ¶¶ 186–89).  The United States has not waived sovereign immunity for claims brought under the RICO Act.  *Abou-Hussein*, 953 F. Supp. 2d at 262–63 (citing *Norris v. U.S. Dep't of Defense*, No. 96-5326, 1997 WL 362495, at *1 (D.C. Cir. May 5, 1997)); *Saltany v. Reagan*, 702 F. Supp. 319, 321 (D.D.C. 1988), *aff'd in part and rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989). Therefore, Defendants argue, the claims should be dismissed under FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction.

Plaintiffs argue that the Federal Defendants should be denied immunity since they may be vicariously liable for the acts of their alleged RICO co-conspirators.  (Pls.' Opp'n at 4).  While it is true that Congress cast a wide net of liability under RICO, 18 U.S.C. § 1961(4); *see also United States v. Turkette*, 452 U.S. 576, 593 (1981) ("The language of the statute . . . reveals that Congress opted for a far broader definition of the word 'enterprise,' and we are unconvinced by anything in the legislative history that this definition should be given less than its full effect."), that legal truth does not alter the sovereign immunity analysis.  The doctrine of sovereign immunity precludes any adjudication of liability, no matter how attenuated, in the first instance.  *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 766 (2002) ("Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability.  Rather, it provides an immunity from suit.").

Because there has been no waiver, the court lacks subject-matter jurisdiction over official capacity RICO claims.[11]

### ii.    Counts Four Through Nine: Anti-Terrorism Act

---

[11] Individual capacity RICO claims are discussed *infra* in Section III.B.

Counts Four through Nine (*see* Am. Compl. ¶¶ 190–236) assert claims under the civil

remedy provision of the Anti-Terrorism Act, which permits a United States national injured by

an act of international terrorism to bring a claim for treble damages.  18 U.S.C. § 2333.  By its

terms, however, no action can be brought under this section against "the United States, an agency

of the United States, or an officer or employee of the United States or any agency thereof acting

within his or her official capacity or under color of legal authority."  18 U.S.C. § 2337(1).  Any

claims against the Federal Defendants for violations of the ATA in their official capacities must

therefore be dismissed for lack of subject-matter jurisdiction.

Plaintiffs argue that suits against the Federal Defendants in their individual capacities can

proceed despite § 2337.  They argue that the Federal Defendants were not acting within their

official capacities because, by definition, the financing of international terrorism is not within

any federal official's capacity.  (Pls.' Opp'n at 19).  This argument is not persuasive for two

reasons: first, it is contrary to the law of immunity in analogous situations that the wrongfulness

of the alleged act does not take it beyond the scope of authority for immunity purposes.[12]  *See,*

*e.g.*, *Belhas v. Ya'alon*, 515 F.3d 1279, 1287–88 (D.C. Cir. 2008) (individual Israeli military

officer immune under Foreign Sovereign Immunities Act from suit alleging war crimes); *Princz*

*v. Fed. Repub. of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) (foreign state does not waive

sovereign immunity by violating *jus cogens*); *see also Smith v. Socialist People's Libyan Arab*

---

[12] One case in this District has held that foreign officials, who are provided immunity using identical language in § 2337(2), may be sued in individual capacities for acts of terrorism even when their acts are sanctioned by the state they represent.  *Hurst*, 474 F. Supp. 2d at 29.  However, this holding gives no meaning to the phrase "under color of legal authority," a phrase which appears in both immunity provisions.  The case on which *Hurst* relies, *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003), did not go so far in finding the officials were not entitled to immunity.  The *Pugh* court held that § 2337(2) barred claims against foreign officials under the ATA, but that individual capacity tort claims, i.e. claims *not* brought under the ATA and therefore not subject to § 2337, were cognizable.  For the reasons discussed in this section, the court disagrees with the *Hurst* court's narrow reading of the immunity provisions.

*Jamahiriya*, 101 F.3d 239, 244 (2d Cir. 1996) (noting that revisions to the Foreign Sovereign

Immunities Act removed sovereign immunity for acts of state-sponsored terrorism only under

particular circumstances); 14 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. &

PROCEDURE § 3655 (3d ed. 2015) ("The fact that the defendant officer's acts were wrongful or

erroneous is not sufficient to demonstrate that they are outside the scope of his or her official

authority.").[13]

Second, Plaintiffs' argument is contrary to the language of § 2337, which confers

immunity both for acts in an "official capacity" *and* acts taken "under color of legal authority."

Immunity must extend beyond lawsuits brought against a defendant in an "official capacity" if

"under color of legal authority" is to have any meaning. *Bilski v. Kappos*, 561 U.S. 593, 607–08

(2010) (statutes must be interpreted to avoid rendering language superfluous or meaningless).

The question for the court is when a federal official sued in his or her individual capacity is

acting "under color of legal authority."

The court has limited resources from which to draw on in interpreting this immunity

provision.  So far as the court can tell, § 2337 has never been applied in the domestic context.

Black's Law Dictionary provides little guidance, defining "color" only as the "appearance, guise,

or semblance; esp., the appearance of a legal claim to a right, authority, or office."  BLACK'S

LAW DICTIONARY 321 (10th ed. 2014).[14]

---

[13] It is also important to note that this provision appears in a statute targeted specifically at terrorism.  If Congress believed that any act of terrorism undertaken by a government official would necessarily result in a waiver of immunity, it is difficult to understand why Congress would include a provision conferring immunity in connection with terrorism in the first place.

[14] Other uses of the phrase "under color of legal authority" in the U.S. Code are in specifically narrow contexts. That phrase appears in the Administrative Procedures Act, which waives sovereign immunity *for claims other than money damages* that "an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  5 U.S.C. § 702.  It also appears in the venue statute, 28 U.S.C. § 1391(e)(1).  The Supreme Court, however, has cautioned against interpreting venue provisions and jurisdictional provisions by reference to each other, given the different purposes each serves.  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 319 (2006).  Indeed, relying on the unique purpose served by venue provisions, the Supreme Court has held that the

The court finds some guidance from cases in which plaintiffs seek money damages from a government official. The phrase "under color" of authority is frequently used in § 1983 litigation against state officials; in that context, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). In § 1983 lawsuits, a state official-defendant's actions are not deemed to be beyond the "color" of legal authority simply because they are alleged to violate the plaintiff's rights; to the contrary, a § 1983 cause of action is premised on the defendant's conduct having been taken in connection with that defendant's role as a government agent. *Gleason v. Scoppetta*, 566 Fed. Appx. 65, 68 (2d Cir. 2014) ("[T]he misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law") (internal quotation marks omitted); *Boyter v. Brazos Cnty.*, No. 09-cv-4132, 2011 WL 1157455, at *7 (S.D. Tex. Mar. 28, 2011) (noting that "private individuals generally are not construed to act under color of law" and therefore private conduct is "not actionable under § 1983").

In *West*, the Supreme Court held that the defendant must have "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." 487 U.S. at 49 (internal quotation marks omitted); *see also Hogan v. Winder*, No. 12-cv-123, 2012 WL 4356326, at *4 (D. Utah Sept. 24, 2012) (noting that the "determinative question is whether [defendant] (1) used the power of his office to act and (2) was able to act only because of that power.") This standard is narrower than the scope of

---

venue provision in § 1391 concerning cases brought against a federal official acting "under color of legal authority" applies only to suits which are "nominally against an individual officer but are in reality against the Government." *Stafford v. Briggs*, 444 U.S. 527, 542 (1980). The legislative history of § 2337, in contrast, provides specifically that Congress intended to "prohibit[] civil actions against the United States, U.S. officials, foreign states or foreign officials" without qualification. S. REP. NO. 102-342, at 47 (1992).

employment test applicable under the Federal Tort Claims Act. *See id* at *3–4*; *see also infra* Section III.A.iii.1. Similarly, in *Bivens* actions, liability may attach in certain circumstances when a federal government official acts "under color of [federal] authority" and violates a plaintiff's constitutional rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971). The test employed in *Bivens* actions for "color of federal authority" is, by and large, the same test applied in the § 1983 context. *Williams v. Hill*, 74 F.3d 1339, 1340 (D.C. Cir. 1996); *Morast v. Lance*, 807 F.2d 926, 931 (11th Cir. 1987).

Whether the court looks to the FTCA scope of employment test or the narrower *West* test, the court is persuaded that each alleged act or omission by the Federal Defendants is within the scope of that Defendant's "official capacity or under color of legal authority." Decisions concerning the direction of United States funds (Am. Compl. ¶¶ 39, 44, 131–34), or military resources (*id.* ¶¶ 49, 54, 136–37) are necessarily decisions that can be taken only by virtue of the power conferred on the Federal Defendants as officers of the United States. The same is true of positions taken on behalf of the United States that Plaintiffs allege have harmed them and the State of Israel—a person acting on behalf of the United States must necessarily occupy a position empowering that person to make such statements. (*See, e.g.*, Am. Compl. ¶ 50 (President Obama has "enhanced and encouraged the intimidation and terrorism of the people of Israel and Jews and Christians present within Israel by publicly supporting and siding with the Muslim Brotherhood and the Jihadist militants in Syria"), ¶ 54 (President Obama, "who is the head of the armed forces, threatened Israel that U.S. aid would be cut off if it does not make peace with HAMAS in light of Muslim civilian casualties in Gaza"), ¶ 151 ("John Kerry has sought to prevent Israel from ending the violence in Gaza")). The various allegations which attempt to transpose nefarious motives on to that conduct do not alter that conclusion. *Gleason*, 566 Fed.

Appx. at 68–69.  Accordingly, Counts Four through Nine must be dismissed against the Federal

Defendants in both their individual and official capacities.

### iii.  Counts Ten Through Twelve

These counts assert claims against the Federal Defendants for assault and battery (*See*

Am. Compl. ¶¶ 237–39), wrongful death (*see id.* ¶¶ 240–43), and intentional infliction of

emotional distress (*see id.* ¶¶ 244–49), which the Federal Defendants argue are barred by the

Federal Tort Claims Act.  Plaintiffs argue that the Act is inapplicable because the claims are

brought against the Federal Defendants as individuals and not against the United States.  (Pls.'

Opp'n at 20).  However, the United States has filed a Westfall certification pursuant to 28 U.S.C.

§ 2679(d) that each of the Federal Defendants was "acting within the scope of his [or her] office

or employment at the time of the incident out of which the claim arose," and therefore the claim

is deemed an action against the United States, and there can be no individual claim.  28 U.S.C. §

2679.[15]  Plaintiffs' argument must therefore be construed as an argument that the certification is

improper.

A Westfall certification is the Government's "proffer of a *prima facie* case that

[defendant] was, in fact, acting within the scope of his employment."  *Koch v. United States*, 209

F. Supp. 2d 89, 92 (D.D.C. 2002) (citing *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir.

1994)).  A plaintiff challenging such a certification has the "burden of coming forward with

specific facts rebutting the certification . . . ."  *Stokes v. Cross,* 327 F.3d 1210, 1214 (D.C. Cir.

2003) (internal quotation marks and citation omitted).  On a motion to dismiss, the question is

---

[15] 28 U.S.C. § 2679, the Westfall Act, does not provide for substitution for claims "brought for a violation of the Constitution" or claims brought for violations of statutes which otherwise authorize a cause of action against the named defendant.  28 U.S.C. § 2679(b)(2).  A *Bivens* action, discussed in Section III.C *infra*, would be the cause of action for pursuing such claims against the Federal Defendants individually.

whether the plaintiff alleged facts which, if true, would establish that the federal agent exceeded the scope of his or her authority.  *Id.* at 1216.

### 1. Federal Defendants Acted Within the Scope of their Employment

To test the validity of the Westfall certification, the court must apply the *respondeat superior* law of the state in which the alleged tort occurred. *See id.* at 1214.  When the tortious injury occurred in a foreign country, the law of the place where the allegedly tortious decisions were made (in this case, the District of Columbia), is the applicable law.  *Kashin v. Kent*, 457 F.3d 1033, 1038 (9th Cir. 2006); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 31 (D.D.C. 2006) (applying Virginia and D.C. law for FTCA claim for injury suffered in Guatemala because relevant decisions were made in Virginia and D.C.); *see also Ameur v. Gates*, 950 F. Supp. 2d 905, 918 (E.D. Va. 2013).

Under D.C. law, the test for whether conduct is within the scope of employment is whether the agent acted "only to further his own interest."  *Schecter v. Merchants Home Deliv., Inc.*, 892 A.2d 415, 428 (D.C. 2006); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) (citing *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986)).  The D.C. Court of Appeals has repeatedly drawn on the RESTATEMENT (SECOND) OF AGENCY, which sets forth four factors, all of which must be present, to make that determination:

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*Brown*, 782 A.2d at 758 n.8 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958) in its entirety) (internal quotation marks and emphasis omitted).  Plaintiffs' argument appears to be that illegal or unconstitutional conduct (e.g., the funding of terrorist organizations) is never

conduct a government official is authorized to perform—an argument possibly implicating the first and third factors.  This argument, however, has no legal support.  *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265–66 (D.D.C. 2004) (rejecting argument that Henry Kissinger was acting outside the scope of his employment because he was alleged to have violated "peremptory norms of international law").

As to the first prong, D.C. law is clear that it is the "type of act" and "not the wrongful character of that act" that is relevant.  *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013).  For instance, in two cases alleging defamation by a member of Congress, the D.C. Circuit held that both members of Congress were acting within the scope of their employment when speaking with the press, because "speaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"  *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006); *Wuterich v. Murtha*, 562 F.3d 375, 384 (D.C. Cir. 2009); *see also Wilson v. Libby*, 535 F.3d 697, 711–12 (D.C. Cir. 2008) (comments to the press to discredit Bush administration critics, which revealed covert agency's identity, were the type of conduct authorized); *Minnick v. Carlile*, 946 F. Supp. 2d 128, 135 (D.D.C. 2013) (defendant DHS employee's responses to questions from defendant's supervisor about plaintiff's performance were within scope of employment, notwithstanding that the answers were allegedly defamatory).  And, more pointedly to Plaintiffs' arguments here, the Circuit in *Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008), upheld a Westfall certification related to defendants who were alleged to have overseen torture of detainees at Guantanamo.  *Id.* at 659–61 (rejecting argument that "serious criminality of the defendants' alleged conduct"—torture of detainees in Guantanamo—precluded a scope of employment filing), *vacated and remanded* 555 U.S. 1083 (2008), *reinstated in relevant part* 563 F.3d 527, 530 (D.C. Cir. 2009).

As noted in Section III.A.ii, *supra*, the conduct alleged here falls squarely within the type of conduct authorized by law.  The President and Secretary of State are authorized to engage in foreign policy and foreign relations on behalf of the United States—indeed that authorization is so far-reaching that it is generally accompanied by broad immunity for foreign policy advisors. *See, e.g.*, *Schneider*, 310 F. Supp.2d at 267 (noting that senior White House aides "entrusted with discretionary authority in such sensitive areas as national security or foreign policy" are afforded absolute immunity from suit (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982)); *see also United States v. Nixon*, 418 U.S. 683, 710 (1974) (noting deference to executive's role in foreign affairs would likely permit withholding of evidence under executive privilege).  The President, as commander in chief, has significant authority over this country's military resources.  U.S. CONST. Art. II § 2.  There can therefore be little question that the President and Secretary of State are authorized to engage in conduct directing the United States' foreign policy and military affairs—the very conduct at issue here.

Plaintiffs allege that "Defendants herein knowingly provide funding and other material support to assist HAMAS in its criminal activities, violence, and warfare because they benefit themselves in various ways."  (Am. Compl. ¶ 26).  These allegations do not take the conduct beyond the scope of employment.  The Restatement test is met, however, even when the agent derives some pleasure or benefit out of the contested actions.  *Ballenger*, 444 F.3d at 665 ("even a *partial* desire to serve the master is sufficient") (emphasis in original).  The D.C. Court of Appeals has held that even sexual assault by an employee may, under certain circumstances, still be within the scope of employment if it is motivated, "at least in part, by a desire to serve" the employer's interests.  *Brown*, 782 A.2d at 758.  In *Brown,* the plaintiff alleged that a security guard touched plaintiff's daughter, who was suspected of shoplifting, in a sexually inappropriate

manner. *Id.* at 755. The Court acknowledged that many sexual assaults would "arise from purely personal motives" but that a "physical search of a suspected shoplifter [wa]s particularly susceptible to [the] interpretation" that it was actuated in part by a desire to serve the employer. *Id.* at 758. Addressing the same factor and reaching the opposite conclusion, the court in *Russell v. Dupree*, 844 F. Supp. 2d 46 (D.D.C. 2012) found that a CIA driver driving home from a restaurant while intoxicated was not acting within the scope of his employment, reasoning that becoming intoxicated would hinder, not help, his ability to perform his job duties. *Id.* at 51.

Here, it is true that Plaintiffs have alleged some ulterior motives for some of the Federal Defendants' alleged conduct, separate and apart from any desire to serve the United States' interests. (*See, e.g.*, Am. Compl. ¶ 62 (President Obama promotes "the international foreign policy interests of Islamic nations" in light of his alleged religion), ¶ 140 ("the Clinton household has amassed a fortune of over $105 million, including from many nations and interests hostile to Jews and to Israel"), ¶ 145 ("Hillary Clinton maintains ties to the Muslim Brotherhood . . . .").) However, the fact that an agent may be motivated by self-interest, or interests other than those of its principal, is not dispositive. *Ballenger*, 444 F.3d at 665. The issue instead is whether there is a complete absence of a desire to serve the principal's interests—and there are no allegations that this is the case. To the contrary, Plaintiffs acknowledge the Federal Defendants' desire to serve the interests of the United States. (Pls.' Opp'n at 11 (the Federal Defendants "have all made it one of the highest priorities of the Obama administration to formulate a peace treaty between Israel and the Palestinians. They have monitored on behalf of U.S. foreign policy and [*sic*] the conduct of the entire U.S. military hot wars in and around Israel.")).

Because Plaintiffs' allegations do not rebut the United States' proffer of *prima face* evidence that the Federal Defendants acted within the scope of their employment, the United

States' certification is effective and all claims under Counts Ten through Twelve, regardless of whether they are styled as claims against the Federal Defendants in their official or individual capacities, are subject to the provisions of the FTCA.

### 2.   The FTCA Bars Counts Ten through Twelve

For two[16] independent reasons, Plaintiffs' tort claims against the Federal Defendants fall outside the waiver of sovereign immunity in the FTCA.

First, the United States' waiver of sovereign immunity in the FTCA does not apply to claims arising out of "assault, battery," or any other intentional torts. 28 U.S.C. § 2680(h). Count Ten—which alleges assault and battery—must therefore be dismissed as against the Federal Defendants, in both their official and individual capacities.

In addition, the waiver of sovereign immunity does not apply to claims arising in a foreign country. 28 U.S.C. § 2680(k). In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)*,* the Supreme Court held that the foreign country exception "bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Id.* at 712. In so holding, the Court rejected what had been known as the "headquarters" doctrine, which had permitted claims under the FTCA for "acts or omissions occurring" in the United States "which have their operative effect in another country." *Id.* at 701 (internal quotation marks and citation omitted). The Supreme Court made clear that it is the place of the *injury*, not the conduct, which controls application of the exception. *Id.* at 712; *see also Gross v. Dev. Alts., Inc.*, 946 F. Supp. 2d 120, 124 (D.D.C. 2013) ("Plaintiffs first suggest that, because USAID's

---

[16] Defendants raised a third argument: Plaintiffs' apparent failure to administratively exhaust their claim pursuant to 28 U.S.C. § 2675(a). (Def.'s Mot. at 22–23). Because there is some doubt as to whether that requirement is jurisdictional, *see, e.g.*, *United States v. Wong*, 135 S.Ct 1625 (2015) (holding that provision requiring exhaustion within two years of injury was not jurisdictional and was subject to tolling), and because other bars to jurisdiction exist under the FTCA, the court will not address Plaintiffs' apparent failure to exhaust their administrative remedies.

negligent direction and oversight occurred in the United States, the foreign-country exception

should not apply. . . . But that line of reasoning is precisely what *Sosa* rejected."); *Garcia v.*

*Sebelius*, 867 F. Supp. 2d 125, 137 (D.D.C. 2012) *vacated in part on other grounds*, 919 F.

Supp. 2d 43 (D.D.C. 2013).

Plaintiffs here allege that they or their decedents were in Israel when violence broke out

in that country.  Each injury was suffered in Israel, indisputably a foreign country.  Claims

arising out of injuries suffered in Israel are not cognizable under the FTCA.

Plaintiffs appear to attempt to relocate their injuries back to the United States, at least in

part, by alleging that the Jack Roe plaintiffs suffered "severe emotional distress," and "the loss of

society, earnings, companionship, comfort," etc. of their decedents.  (Am. Compl. at 2–3).  The

Jack Roe plaintiffs were not present in Israel during the violence of 2014; rather they are

relatives of others who were.  (Am. Compl. ¶ 18).  To the extent Plaintiffs believe that these

harms suffered in the United States suffice to place the injury in the United States, that argument

is not persuasive.

*Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008), involved a similar argument.  The

plaintiff was the wife of a Guatemalan rebel commander who purportedly died at the hands of

CIA operatives.  She sued CIA employees on behalf of her husband's estate and on her own

behalf for emotional distress.  The D.C. Circuit held that any claims brought by the husband's

estate were barred because the injuries were suffered in Guatemala and "to the extent Harbury

alleges her own emotional injuries in the United States as a result of the death of her husband,

those derivative claims similarly arise in Guatemala for purposes of the FTCA because they are

based entirely on the injuries her husband suffered there."  *Id.* at 423.  Like the plaintiff in

*Harbury*, Plaintiffs' claims are barred by the foreign country exception and Counts Eleven and Twelve must be dismissed as against the Federal Defendants, in all capacities.

### B. RICO Claims in Individual Capacities

The court has already determined that Counts Four through Twelve assert claims against the Federal Defendants that are barred by immunity, even when styled as claims against the Federal Defendants in their individual capacities. The only remaining potentially viable claims are Counts One, Two, and Three—the RICO claims against the Federal Defendants in their individual capacities. As the Federal Defendants correctly point out, President Obama is absolutely immune from suit, and Secretaries Clinton and Kerry are protected by qualified immunity. (Def.'s Mot. at 26–28). And, notwithstanding any immunity, Plaintiffs have not adequately alleged that they have standing to assert any RICO claims.

#### i. Presidential Immunity

The President is absolutely immune from "damages liability for acts within the 'outer perimeter' of his official responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). Absolute immunity is extended to few officers, and it is denied only if the officer acts "without any colorable claim of authority." *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (addressing absolute prosecutorial immunity). Immunity is not overcome by "allegations of bad faith or malice." *Barrett v. Harrington*, 130 F.3d 246, 254–55 (6th Cir. 1997) (judicial immunity); *see also Bernard*, 356 F.3d at 504 (noting that "racially invidious or partisan prosecutions, pursued without probable cause, are reprehensible, but such motives do not necessarily remove conduct from the protection of absolute immunity"). Nor is immunity defeated by an allegation that the president acted illegally. *Fitzgerald*, 457 U.S. at 756.

In *Fitzgerald*, the plaintiff alleged that he was terminated from the Air Force, at the direction of the President, in violation of civil service whistleblower protections. Despite the

allegations of illegality, the Supreme Court held that because it "clearly is within the President's constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force" the President had acted "well within the outer perimeter of his authority." *Id.* at 757. In this case, the court has already discussed the inherent authority of the President to conduct American foreign policy, including the use of funds and military resources. As these actions are clearly within the perimeter of the President's official responsibility, absolute immunity applies.

Plaintiffs' argument to the contrary is not persuasive. (Pls.' Opp'n at 21). Plaintiffs point to the holding in *Clinton v. Jones*, 520 U.S. 681, 694–95 (1997) in support of their argument that the President is not "above" the law. That case addressed a situation distinguishable from the one at bar. *Clinton* affirmed broad and absolute presidential immunity, but limited that immunity to acts "taken in an official capacity"—and held that President Clinton's conduct *before* he became President was not an official act of the President such that absolute immunity attached. *See* 520 U.S. at 695. Plaintiffs also cite to *United States v. Nixon*, 418 U.S. 683 (1974) for the proposition that the President cannot use immunity to hide illegality. That case, however, did not address the issue of presidential immunity from civil liability; rather, it dealt with a subpoena for information from the President, and did not seek to hold the President liable for damages. *Id.*; *see also Fitzgerald*, 457 U.S. at 760 (noting distinction). The court finds that Plaintiffs have failed to show that the President's alleged actions fall outside of activity that is protected by immunity, and therefore their RICO claims cannot proceed against President Obama.

### ii. Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244

(2012) (internal quotations omitted).  In evaluating a qualified immunity defense, the court must

determine whether plaintiff has alleged the violation of such a right, and whether the right was

"clearly established" at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223,

231–32 (2009).  It is within the court's discretion to evaluate the latter factor first, or vice versa.

*Id.* at 236.  Qualified immunity analysis applies to claims against public officials for RICO

violations.  *See, e.g.*, *BEG Invs., LLC v. Alberti*, 34 F. Supp. 3d 68, 81–82 (D.D.C. 2014).

Plaintiffs have not responded to the qualified immunity argument asserted by the Federal

Defendants.[17]  In this Circuit, when opposition papers fail to address certain arguments raised by

the moving party, the court may treat those arguments as conceded.  *Hopkins v. Women's Div.,*

*Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (internal citations omitted),

*aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004).  Moreover, it is not enough to merely "mention a

possible argument in the most skeletal way, leaving the [C]ourt to do counsel's work, create the

ossature for the argument, and put flesh on its bones."  *Dinkel v. MedStar Health, Inc.*, 880 F.

Supp. 2d 49, 58 (D.D.C. 2012) (quoting *Scheider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir.

2005)) (alterations in original).  Instead, the opposing party must put forth fully formed

arguments or risk having the argument treated as conceded.  Defendants' arguments regarding

qualified immunity will therefore be treated as conceded.  *Dinkel*, 880 F. Supp. 2d at 58.

### iii.  RICO Standing

The Federal Defendants also argue that Plaintiffs' RICO claims are not cognizable

because Plaintiffs lack standing to assert those claims.  (Def.'s Mot. at 16).

---

[17] Plaintiffs (very briefly) address immunity in the context of the ATA, the FTCA, and Presidential immunity, but make no mention of qualified immunity for Secretaries Clinton and Kerry.

A RICO plaintiff must allege injury to his or her "business or property." *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 267–68, 279 (1992) (O'Connor, J., concurring in part and concurring in the judgment). Allegations of personal injury do not suffice.[18] *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 19 (D.D.C. 2005) (citing *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F. Supp. 2d 86, 100–02 (D.D.C. 2003)). In *Burnett,* the court rejected the argument that economic losses flowing from personal injuries amounted to an injury to "business or property," recognizing that Congress intended RICO to remedy a particular and narrow subset of injuries. 274 F. Supp. 2d at 101–02. Plaintiffs counter only as to plaintiff Klayman,[19] arguing that "an injury to [Klayman] is necessarily an injury to his law practice," and that his visit to Israel in 2014 "was for business purposes." (Pls.' Opp'n at 18). Therefore, Plaintiffs argue, "all the harm done to Plaintiff Klayman as an individual necessarily caused harm to Plaintiff Klayman's business and property." (*Id.*). The Federal Defendants correctly note that this is precisely the argument previously rejected by multiple courts. *See, e.g.*, *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) (noting that "loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering are often to be found, intertwined, in the same claim for relief" and denying standing); *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992) (noting that "Doe's loss of earnings, her purchase of a security system and her employment of a new attorney are plainly derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO"); *Burnett*, 274 F. Supp. 2d at 100–01. Under the law, the Plaintiffs

---

[18] The Amended Complaint alleges, in conclusory fashion, that the Plaintiffs and their decedents "suffered [among other things] the loss of valuable property." (Am. Compl. ¶¶ 171–72). The Amended Complaint does not, however, allege any particular acts directed at Plaintiffs' or their decedents' "business or property." The only potential source of the "loss of valuable property" alleged in the Amended Complaint is the derivative loss of that property stemming from the Plaintiffs/decedents' personal injuries.

[19] Because Plaintiffs failed to respond to the standing argument as to the John Doe and Jack Roe plaintiffs, that argument is conceded.

lack standing to bring these RICO claims, which must therefore be dismissed against *all* Defendants.

### C.  Plaintiffs' Bivens Claims

Plaintiffs do not assert any specific claim pursuant to *Bivens*, although they allege that "[j]urisdiction is also proper under *Bivens* . . . in so far as the actions violate the 1st, 4th, 5th and 14th Amendments to the U.S. Constitution."[20]  (Am. Compl. ¶ 11).  Plaintiffs assert that this language suffices to plead a *Bivens* claim, arguing that they need only allege they were "deprived of a constitutional right by a federal agent acting under color of federal authority."  (Pls.' Opp'n at 17).

In analyzing a *Bivens* claim, a court must first "identify the exact contours of the underlying right said to have been violated and determine whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 71 (D.D.C. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)) (internal quotation marks omitted).  To do so, the court must start by identifying what "elements a plaintiff must plead to state a claim," because "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue."  *Iqbal*, 555 U.S. at 675–76.  Plaintiffs' single, conclusory sentence provides no context identifying which rights have allegedly been violated: Plaintiffs' freedom of expression? Freedom of speech?  Right to equal protection or due process?  Freedom from unreasonable searches?  And, even if the court could divine from the limited contextual clues which rights were implicated, the Complaint is devoid of allegations tending to show that any Federal Defendant acted with the requisite specific intent.  *Id.* at 676–77.  As the

---

[20] The 14th Amendment applies only to the states, *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954), and the Federal Defendants were officials of the federal government, not the government of any state.

Federal Defendants note, "Plaintiffs make no effort to explain what rights under these Constitutional amendments are at issue," leaving the Federal Defendants (and the court) to "guess what cause of action Plaintiffs intend to present . . . ." (Def.'s Mot. at 25–26). As this is precisely the analysis adopted by *Iqbal*, Plaintiffs cannot reasonably argue that this imposes a heightened pleading standard on the Plaintiffs. (Pls.' Opp'n at 17). The court therefore finds that Plaintiffs have failed to state a *Bivens* claim upon which relief can be granted.

### D.  Plaintiffs' Claims under the Alien Tort Claims Act

Although Plaintiffs do not allege a separate claim, the Amended Complaint invokes the Alien Tort Claims Act as a basis for jurisdiction. (Am. Compl. ¶ 8). That Act, 28 U.S.C. § 1350, confers jurisdiction over civil actions by an alien for torts "committed in violation of the law of nations or a treaty of the United States." Any such tort claims brought against federal officers falls within the scope of the Federal Tort Claims Act which, as discussed above in Section III.A.iii.2, bars suit here. *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1329 (D.C. Cir. 2014). The ATCA therefore establishes no jurisdiction over, or cause of action against, the Federal Defendants.

### E.  Claims brought by anonymous Plaintiffs

The Federal Defendants argue that all claims brought by the pseudonymous plaintiffs must be dismissed for failure to seek or obtain leave to proceed under pseudonyms. (Def.'s Mot. at 7–10). The D.C. Circuit has not squarely addressed this issue, although some other circuits have held that failure to obtain leave precludes the exercise of subject-matter jurisdiction. *W.N.J. v. Yocom*, 257 F.3d 1171, 172 (10th Cir. 2001) ("When a party wishes to file a case anonymously or under a pseudonym, it must first petition the district court for permission to do so."); *Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 637 (6th Cir. 2005). Plaintiffs counter that they "are afforded the opportunity to proceed without having their names and physical addresses"

made public "[d]ue to the serious threat of harm" and retaliation the anonymous plaintiffs would face by suing a recognized terrorist organization. (Pls.' Opp'n at 26–27). This may well be true, but Plaintiffs did not request leave to proceed anonymously.

The court recently denied a motion for leave to proceed under a pseudonym but continued to exercise subject matter jurisdiction over the case notwithstanding the rule in some circuits that there is no jurisdiction until there is a named plaintiff. *See Roe v. Bernabei & Wachtel PLLC*, No. 14-cv-1285 (TSC), 2015 WL 1733648, at *3 (D.D.C. Mar. 26, 2015). However, in that case, all parties knew plaintiff's identity, that she was a real person with standing to assert her claims, and that, other than the plaintiff's name and address, there were no other apparent barriers to jurisdiction. *Id.* at *4 n.6. That is not the case here. The court cannot evaluate, for example, whether the anonymous plaintiffs have standing to bring claims as personal representatives of their decedents, have standing to bring claims under RICO, or whether permitting them to proceed anonymously will unduly prejudice the Defendants. Accordingly, the claims brought by anonymous plaintiffs will be dismissed. The anonymous plaintiffs may make an *ex parte* motion within fourteen (14) days of the date of this opinion for leave to reinstate their claims under pseudonyms. *See, e.g.*, *Qualls v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005) (describing ad-hoc process for obtaining leave to proceed via pseudonyms).

### F.  Service of Process on the Federal Defendants

The Federal Defendants argue for dismissal on the basis that Plaintiffs failed to properly effect service pursuant to FED. R. CIV. P. 4. (Def.'s Mot. at 3). Because the court is dismissing all claims against the Federal Defendants for lack of subject matter jurisdiction, this argument is not dispositive. However, because Plaintiffs may seek leave to amend the complaint, the

adequacy of service remains relevant.  The court finds that service on the Federal Defendants was inadequate.[21]

First, it appears that Plaintiff Larry Klayman attempted to personally serve the Federal Defendants.  (Pls.' Opp'n at 23 (the White House is "precisely where Plaintiff served Defendant Obama")).  If so, as Defendants note (Def.'s Reply at 3 & n.3), this violated Rule 4(c)(2), which requires service by someone who is not a party.  Second, serving Secretaries Clinton and Kerry at their "primary place of employment" and "place of business," respectively, as Plaintiffs allege they did (Pls.' Opp'n at 23–24), does not constitute proper service on individuals.  FED. R. CIV. P. 4(e).  If Plaintiffs seek leave to file an amended complaint and if the court grants such a motion, Plaintiffs will need to serve a second amended complaint on the Federal Defendants in a manner which comports with the Federal Rules or applicable state law.[22]

### G.  Service of Process on Malik Obama and Hamas

#### i.  Service on Malik Obama

Plaintiffs have represented that they made "several good faith attempts" to serve Malik Obama, but that none were successful.  (Pls.' Service Response ¶¶ 4–7, ECF No. 19).  Plaintiffs state that they attempted service on Malik Obama by a process server at three addresses in Virginia, including two post-office boxes related to the Barack H. Obama Foundation and a residential address.  (*Id.*).  At the residential address, Plaintiffs' process server was told that

---

[21] Plaintiffs have presented only unsworn allegations, not affidavits, in an opposition concerning their attempted service.  The court assumes the truth of these assertions for purposes of the pending motion but notes that future attempts at service must be properly documented.

[22] Plaintiffs argue in the alternative that the court may authorize "alternative service" on the Federal Defendants pursuant to FED. R. CIV. P. 4(f)(3).  (Pls.' Opp'n at 24–26).  That rule pertains to service of defendants *outside* the United States, however, and is inapplicable to service on the Federal Defendants.

Malik Obama does not live at that address.  (*Id.* ¶ 6).  Plaintiffs suggest that Malik Obama may be using "false addresses" to evade service.  (*Id.* ¶ 7).

These efforts are inadequate under Rule 4.  Neither Federal nor Virginia law permits service of an individual defendant at his place of business, and yet the first two addresses attempted for service on Malik Obama were addresses associated with his place of work,[23] not his residence.  *See* Fed. R. Civ. P. 4(e); Va. Code Ann. § 8.01-296 (2014).  Even though the delay in service here is due at least in part to Plaintiffs' own errors,[24] there exists a reasonable prospect that Plaintiffs could accomplish service.  Plaintiffs will have until December 31, 2015 to effect service on Malik Obama.  Plaintiffs shall file monthly status reports with the court describing their efforts to serve Malik Obama and if necessary may make a procedurally proper motion for alternative service pursuant to Fed. R. Civ. P. 4(f)(3) at any time prior to December 31, 2015.

### ii.  Service on Hamas

It does not appear that Plaintiffs have attempted to serve Hamas.  Plaintiffs argue that as a terrorist organization, Hamas has "no known physical address" and thus "cannot be served by conventional methods."  (Pls.' Service Response ¶¶ 8–9).  The Plaintiffs further speculate that "because of the inherent dangers" in serving such an organization, which would "likely [be] hostile" to the process server, they require more time to develop an alternate means and to accomplish service.  (*Id.* ¶¶ 10–11).  As of the date of this Opinion, Plaintiffs have not moved for

---

[23] Plaintiffs' Response refers to the Foundation as the party in this action (*e.g.*, Pls.' Service Response ¶ 4); however the Amended Complaint makes clear that Malik Obama, the person, is the defendant.  (*e.g.*, Am. Compl. ¶ 105).

[24] If Malik Obama resided at the address in Virginia, it appears service could have been completed there.  The court is without sufficient information to evaluate Plaintiffs' speculative assertion that Malik Obama is using a false address to evade service (Pls.' Service Response ¶ 7) but, in any event, that assertion is not material to the court's decision.

an order seeking authorization to accomplish service by alternative means.  This weighs in favor

of dismissal for failure to effectuate service.  *See Mann*, 681 F.3d at 376.  However, Circuit

precedent suggests that a reasonable prospect of service may outweigh other considerations.  *Id.*

Hamas has been successfully served in the past.  In *Estates of Ungar v. Palestinian Auth.*,

for example, a U.S.-based HAMAS agent was served at his Illinois residence.  304 F. Supp. 2d

232, 258–59 (D.R.I. 2004).  The court found that since Hamas was a foreign unincorporated

association, service on an "officer, [or] managing or general agent" such as a "high level

HAMAS military operative" was sufficient under Rule 4(h)(1)(B).  *Id.*

Similarly, in *Sisso v. Islamic Repub. of Iran*, the plaintiff properly served Hamas pursuant

to Rule 4(f) and the Hague Convention by delivering the summons and complaint, "translated

into Arabic, on the Director of the Courts of the State of Israel, which handles requests for

service of process in the disputed West Bank territories.  Israeli authorities thereafter served the

documents on Sheik Hassan Yousef, a Hamas leader in the West Bank city of Ramallah."  448 F.

Supp. 2d 76, 88 (D.D.C. 2006).  Because service on Hamas is possible, Plaintiffs will be

afforded the opportunity to perfect service, subject to the same provisions described above with

regard to service on Malik Obama.

### H.  Diplomatic Immunity of Secretary-General Ban Ki-Moon

Secretary-General Ban Ki-Moon has not appeared in this action.  Plaintiffs assert they

validly served process on the Secretary-General on May 8, 2015 by leaving a copy of the

summons and complaint on the desk of a United Nations security guard, who refused to accept

service or give his name.  (Pls.' Service Response ¶ 3.).

This attempt at service does not appear to comply with any method of service

contemplated by the Federal Rules or New York State law.  *See* Fed. R. Civ. P. 4(e) (permitting

service in compliance with the law of the state in which service is made, by delivering a copy to

the individual personally, by leaving a copy at the individual's dwelling, or by delivering a copy

to an authorized agent).  Although New York permits service on a defendant by delivery to a

"person of suitable age and discretion at the [defendant's] actual place of business," that delivery

must be followed by mailing a copy of the summons and complaint.  N.Y. C.P.L.R. § 308(2)

(CONSOL. 2015).  Plaintiffs provided no proof of any such mailing, and have therefore failed to

meet their burden of establishing proper service.  *Light*, 816 F.2d at 751.  It is also not clear

whether an unnamed security guard who refuses to accept service would constitute a "person of

suitable age and discretion" under New York law.  *See, e.g.*, *TAGC Mgmt., LLC v. Lehman*, 842

F. Supp. 2d 575, 584–85; *Lederman v. Benepe*, No. 12-cv-6028,  2014 WL 1318356, at *5

(S.D.N.Y. Mar. 28, 2014).[25]

Even if service had been properly accomplished, however, the Secretary-General's

position as a diplomat accorded immunity independently requires dismissal.

Plaintiffs devote substantial effort in their submission on the Secretary-General's

immunity to argue that 22 U.S.C. § 254d, which requires dismissal of claims against an

individual entitled to immunity under the Vienna Convention or any other laws "extending

diplomatic privileges and immunities," does not apply to the United Nations Secretary-General.

(Pls.' Immunity Response at 2, 6–10, ECF No. 23).  Their arguments are unavailing.  Pursuant to

the Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T.

1418 (the "General Convention"), the Secretary-General of the United Nations is accorded the

same immunity as all diplomatic envoys.  *Id.* art. V, § 18; *Georges v. United Nations*, No. 13-cv-

---

[25] The United States also notes that service was invalid under the Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, June 26, 1947, T.I.A.S. No. 1676 (the "Headquarters Agreement").  (Statement of Interest at 7–8).  The Headquarters Agreement provides that service of process "may take place within the headquarters district only with the consent of and under conditions approved by the Secretary-General."  *Id.*, art. III, § 9(a).

7146, 2015 WL 129657, at *4 (S.D.N.Y. Jan. 9, 2015).  The General Convention is self-executing, meaning it is directly binding on federal courts without the need for further implementing legislation.  *Devi*, 861 F. Supp. 2d at 141 (citing *Tachiona v. United States*, 386 F.3d 205, 217 n.6 (2d Cir. 2004); *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010)).  The General Convention directly binds federal courts to accord the U.N. Secretary-General the immunity given to all diplomatic envoys under the Vienna Convention.

Plaintiffs also argue that even if the Vienna Convention did apply (and it does), immunity still would not attach because the actions complained of are not official functions or are within the scope of the commercial activity exception.  (Pls.' Immunity Response at 2–6).  Article 31 of the Vienna Convention provides for full civil immunity except for: "[a] real action relating to private immovable property situated in the territory of the receiving State," "[a]n action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person," or "[a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  *Id.* art. 31, ¶ 1(a)–(c).  In contrast, under Article 37 of the Convention, "[m]embers of the administrative and technical staff of the mission, together with members of their families forming part of their respective households, shall . . . enjoy the privileges and immunities specified in [A]rticles 29 to 35, except that [Article 31 immunity] shall not extend to acts performed outside the course of their duties."  Members of a mission's service staff receive immunity limited to "acts performed in the course of their duties."  *Id.* art. 37, § 3.  Plaintiffs' citation to Article 37 in support of their argument that immunity does not attach (Pls.' Immunity Response at 4) is therefore unpersuasive, because Article 37 does not apply to the Secretary-General.

The contrast between the nearly absolute immunity accorded under Article 31 and the more limited immunity in Articles 37 and 39 is illustrated by *Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010), on which Plaintiffs rely extensively to argue that the Secretary-General's alleged conduct is commercial activity outside his official functions. *Swarna* dealt with immunity under Article 39 of the Vienna Convention, which provides "'residual' immunity, which is a less expansive immunity that remains with the former diplomats for certain acts committed during their occupation of the diplomatic station." *Id.* at 134. In *Swarna,* which involved claims for human trafficking and slavery brought by a domestic worker forced to work for a former diplomat and his wife, the court held first that the wife of a former diplomat was not entitled to residual immunity (although she would have been entitled to immunity during the time her husband occupied a diplomatic post). *Id.* As to the diplomat himself, the court noted that residual immunity extends only to acts performed in the exercise of diplomatic functions and not to "acts that are 'incidental'" to those functions. *Id.*; *see also id.* at 137 (noting that "[s]itting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service"). Consequently, the court ruled that Article 39 immunity was limited only to official acts, and the hiring of a purely private domestic worker was not an official act. *Id.* at 137–38.

Unlike Article 39 immunity, Article 31 immunity is nearly absolute and the commercial activity exception has been found to be inapplicable to conduct very similar to the conduct at issue in *Swarna*. In *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122 (D.D.C. 2009), plaintiffs attempted to sue a Kuwaiti diplomat who had hired them as domestic workers while he served as diplomatic attaché in the United States. *Id.* at 125. Plaintiffs argued that the commercial activity exception applied since human trafficking is a commercial activity. *Id.* at 127. The court

rejected that literal construction and agreed with the Fourth Circuit, which had previously held that the commercial activity exception applied "to trade or business activity engaged in for personal profit." *Id.* (citing *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996)). *Montuya v. Chedid*, 779 F. Supp. 2d 60 (D.D.C. 2011) involved similar claims on behalf of a domestic worker for an ambassador and his wife, and was similarly unsuccessful in invoking the commercial activity exception to immunity. *Id.* at 63–64; *see also Gonzalez-Paredes v. Vila*, 479 F. Supp. 2d 187, 192–93 (D.D.C. 2007) (former domestic worker hired by Argentinian diplomat could not sue diplomat in light of Article 31 immunity); *Brzak*, 597 F.3d at 113 (claims of employment discrimination at the U.N. related to conduct within official function for purposes of Article 39 residual immunity); *De Luca v. United Nations Org.*, 841 F. Supp. 531, 534 (S.D.N.Y. 1994) (Assistant Secretaries-General immune from claims for improper tax withholding and denial of health insurance coverage to U.N. employees).

No exception applies here. Even assuming for the purposes of argument that the alleged conduct is "commercial activity," it is nonetheless conduct squarely within the Secretary-General's "official functions." (*See, e.g.*, Am. Compl. ¶ 157 ("Ban Ki-Moon has illegally operated the resources and assets of the United Nations to support HAMAS' terrorist activities materially and directly . . . ."); ¶ 158 ("Ban Ki-Moon has operated the resources and assets of the United Nations including public schools run by the United Nations within Gaza to house deadly military rockets used in war crimes . . . ."). Secretary-General Ban Ki-Moon is essentially accused of operating the United Nations and making determinations about the United Nations' resources in a manner that enabled and facilitated Hamas' terrorism and war crimes. (Am. Compl. ¶¶ 155, 157). Plaintiffs argue that by alleging the commission of war crimes and other violations of municipal and international law (*e.g.*, Pls.' Immunity Response at 3 ("[s]upporting

terrorism and war crimes and other illegal activity are clearly not 'official functions'" of the U.N.

Secretary-General")) they have exempted themselves from or overcome immunity.  However

nothing in the text of either the Vienna Convention, the General Convention, or 22 U.S.C. §

254(d) implies an exception to immunity for those violations.  *See, e.g.*, *Devi*, 861 F. Supp. 2d at

141–42; *Sabbithi*, 605 F. Supp. 2d at 129; *Aidi v. Yaron*, 672 F. Supp. 516, 518 (D.D.C. 1987)

(Israeli attaché accused of massacres in Lebanese refugee camps was immune from a wrongful

death suit); *see also Princz*, 26 F.3d at 1174 (citing *Siderman de Blake v. Rep. of Argentina*, 965

F.2d 699, 719 (9th Cir. 1992)).  As the *Swarna* court noted, the question is not "whether the

underlying conduct actually occurred, or whether it was wrongful," but is instead a "functional"

and "objective" test, looking to the acts in question.  622 F.3d at 137 (citing *Brzak*, 597 F.3d at

113).  The functions at issue here, decisions on the direction of U.N. funds and resources, are

most definitely within the "ambit of the [Secretary-General's] professional responsibilities."

*Brzak*, 597 F.3d at 113; *see also Georges*, 2015 WL 129657, at *4 (Secretary-General Ban Ki-

Moon immune from contract and tort claims that U.N. was responsible for cholera epidemic in

Haiti); *Van Aggelen v. United Nations*, No. 06-cv-8240, 2007 WL 1121744, at *1–2 (S.D.N.Y.

Apr. 12, 2007) (racketeering claim against Secretary-General was dismissed on immunity

grounds because all acts were taken "purely in an official capacity or in furtherance of U.N.

business").  Moreover, there is no allegation that any of the funding decisions were made solely

for the Secretary-General's "personal profit," which other courts have deemed necessary in

determining a commercial activity exception.  *Sabbithi*, 605 F. Supp.2d at 127 (citing *Tabion*, 73

F.3d at 537); *Gonzalez Paredes*, 479 F. Supp. 2d at 193.

   In light of the clear applicability of diplomatic immunity, all claims against Secretary-

General Ban Ki-Moon in any capacity are DISMISSED.

**IV.      CONCLUSION**

Plaintiffs have pled no cognizable claims against the Federal Defendants.  Plaintiffs lack standing to assert RICO claims and, even if they properly alleged standing, could assert no claims against the Federal Defendants in light of sovereign, presidential, and qualified immunity. Those immunities similarly bar the remaining enumerated claims asserted against the Federal Defendants.  To the extent Plaintiffs intended to bring *Bivens* claims or claims pursuant to the ATCA against the Federal Defendants, the allegations related to those claims do not suffice to state such claims.  Plaintiffs' may make a procedurally proper motion for leave to file a Second Amended Complaint to the extent it is possible to cure the defects identified in the First Amended Complaint.

As to the remaining Defendants, diplomatic immunity bars all claims against Secretary-General Ban Ki-Moon and he must be dismissed as a defendant.  Plaintiffs' request for an extension of time to effect service on the remaining Defendants will be granted.

Finally, because the anonymous plaintiffs failed to follow procedures for obtaining leave to proceed under pseudonyms, their remaining claims will be dismissed, with the potential for reinstatement if the court receives and grants a proper request to proceed under pseudonyms.

A corresponding order will issue separately.

Dated: August 21, 2015